**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MURRAY ENERGY CORPORATION )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>WILLIAMSON ENERGY, LLC )<br>)<br>Defendants )<br>) | Case No. 3:14-cv-00805-NJR-DGW<br><br>**Jury Trial Demanded** |

**COMPLAINT**

Plaintiff Murray Energy Corporation ("MEC"), as its Complaint for breach of contract against Defendant Williamson Energy, LLC ("Williamson"), alleges as follows:

**INTRODUCTION**

1. MEC operates underground and surface coal mining operations throughout the United States. MEC has invested significant resources to develop a "longwall" coal mining operation in Franklin and Saline counties in Southern Illinois. The coal mined from this longwall operation is unique, with specific sulfur content and heat values.

2. As part of its development of the longwall mining operation in Southern Illinois, MEC creates site-specific plans depicting the current status of active mining and progression of tracts to be mined going forward. The plans are confidential and constitute MEC trade secrets because they reveal the properties and mineral rights that MEC intends to purchase or lease over the length of the period covered by the plan. Competitors armed with that information could frustrate MEC's longwall mining operations with strategic purchases of land and/or mining rights that would not only disrupt mining operations but inflate the market for purchasing land and mining rights along the planned longwall mining path.

3. In 2008 MEC marketed for sale its coal production operations in Hamilton, Saline, and Franklin Counties (the "Proposed Transaction"). One of the interested potential purchasers of those operations was Williamson, a direct competitor of MEC. Before allowing Williamson to perform due diligence on MEC's coal production operations, the parties negotiated and entered into a Confidentiality Agreement. *See* Ex. A (the "Confidentiality Agreement"). In general, MEC disclosed its confidential and proprietary information regarding MEC's business and mining operations, including access to MEC's plans for the mining operations subject to the Proposed Transaction. Williamson agreed to not use the disclosed information for any purpose other than the Proposed Transaction, and specifically agreed it would not use the confidential information to acquire any mineral and/or real property rights related to MEC's operations for eight years. Ultimately, the parties did not agree to a sale of the coal production operations.

4. Recently, MEC discovered that in 2009, Williamson (and/or its affiliates) began purchasing property and mineral rights directly in the path of MEC's longwall mining plan. Williamson used the information disclosed by MEC to identify and purchase mining rights for properties identified in the plans disclosed to Williamson in connection with the Proposed Transaction (the "Mining Rights"). Williamson purchased the Mining Rights at prices far exceeding their market value.

5. Because of the small size of the purchases and their location to MEC mining operations, the tracts associated with the Mining Rights provide no mining potential to Williamson. Rather, the only economic value of these purchases to Williamson is to frustrate MEC's ability to execute its mining plans. Williamson is attempting to hinder MEC's operations to gain an unfair competitive advantage. Williamson has continued to make purchases as recently as

2013. On information and belief, Williamson is continuing its efforts to acquire additional Mining Rights.

6. Williamson's use of MEC's confidential information in connection with its purchase of the Mining Rights breached the Confidentiality Agreement.

7. As a result of Williamson's breach, MEC has been forced to purchase or lease the mining rights to numerous other plots far earlier than it otherwise would have. Williamson's presence as a buyer in the market and above-market price purchases have significantly increased the cost to MEC of making those purchases. MEC may also lose significant revenue due to machinery downtime and incur the significant costs associated with transporting its mining equipment to alternative locations. The loss of production capacity also threatens MEC's ability to satisfy coal production contracts with energy producers, damaging MEC's reputation, good will and future business opportunities.

8. MEC brings this action to: (1) enjoin Williamson's improper use of confidential information belonging to MEC in violation of the Confidentiality Agreement; and (2) recover damages resulting from Williamson's misappropriation of MEC's confidential information.

## PARTIES

9. MEC is a corporation organized under the the laws of Ohio with its principal place of business in St. Clairsville, Ohio.

10. Williamson is a Delaware limited liability company that has its principal place of business in St. Louis, Missouri. Williamson is registered to do business in Illinois.

## JURISDICTION AND VENUE

11. MEC is an Ohio corporation that has its principal place of business in St. Clairsville, Ohio. MEC's citizenship is Ohio.

12. Williamson is a Delaware limited liability company that has its principal place of business in St. Louis, MO.  The sole member of Williamson is Foresight Energy LLC.  *See* Foresight Energy LP 424B1 Prospectus. The sole member of Foresight Energy LLC is Foresight Energy LP.  *Id.*

13. Foresight Energy LP is a Delaware limited partnership with its principal place of business in St. Louis, Missouri. The partnership issued its initial public offering on June 17, 2014, and is currently owned by Foresight Reserves LP, six individual partners, and public unit holders. *See* S&P Capital IQ Public Ownership of Foresight Energy LP.

14. The six individual partners of Foresight Energy LP are Christopher Cline, Michael J. Beyer, Oscar A. Martinez, Rashda M. Buttar, Christopher N. Moravec, and E. Hunter Harrison.  *Id.*  On information and belief: Christopher Cline is a citizen of Florida; Michael J Beyer is a citizen of Florida or Pennsylvania; Oscar A. Martinez is a citizen of Missouri; Rashda M. Buttar is a citizen of Missouri; Christopher N. Moravec is a citizen of Kentucky; and E. Hunter Harrison is a citizen of Florida or Connecticut.  None of these partners is a citizen of Ohio. *See* Accurint Address Reports for Foresight Energy LP's Individual Partners; *see also Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1087 (9th Cir. 2014) (holding that where "facts supporting jurisdiction are not reasonably ascertainable by the plaintiff," the plaintiff "should not be required to plead jurisdiction affirmatively based on actual knowledge" (citing *Med. Assurance Co. v. Hellman*, 610 F.3d 371, 376 (7th Cir. 2010) for this "sensible principle")).

15. Foresight Reserves LP is a Nevada limited partnership with its principal place of business in Palm Beach, Florida. Foresight Reserves LP is wholly owned by Riverstone Holdings, LLC and The Cline Group, LLC. *See* Foresight Energy LP 424B1 Prospectus.

4

16. Riverstone Holdings, LLC is a Delaware limited liability company with its principal place of business in New York, New York.  Riverstone Holdings LLC is owned by one or more of the following: Pierre F. Lapeyre, David M. Leuschen, Michael B. Hoffman, Stephen S. Coats, Edmund John Philip Browne, James T. Hackett, Edward Bartow Jones, N. John Lancaster, Stephen J. Schaefer, and R. Baran Tekkora, Andrew Ward, and Elizabeth K. Weymouth. *See* S&P Capital IQ Riverstone Holdings, LLC, Private Investment Firm Profile; http://riverstonellc.com/#!people (listing partners of Riverstone Holdings, LLC). On information and belief: Pierre F. Lapeyre is a citizen of New York or Connecticut;  David M. Leuschen is a citizen of New York; Stephen S. Coats  is a citizen of Tennessee or Kentucky; Edmund John Philip Browne is a citizen of England; James T. Hackett is a citizen of Massachusetts or Texas; Edward Bartow Jones is a citizen of Connecticut or New York; N. John Lancaster is a citizen of Texas or Connecticut; Stephen J. Schaefer is a citizen of Texas; Michael B. Hoffman is a citizen of New York; R. Baran Tekkora is a citizen of New York; Andrew Ward is a citizen of New York; and Elizabeth K. Weymouth is a citizen of New York. None of Riverstone Holdings, LLC's members is a citizen of Ohio. *See* Accurint Address Reports for Riverstone Holdings LLC's Members; S&P Capital IQ Riverstone Holdings, LLC, Professionals (listing partners' office locations); *see also Carolina Cas. Ins. Co.*, 741 F.3d at 1087; *Hellman*, 610 F.3d at 376.

17. The Cline Group, LLC is a Pennsylvania and Delaware limited liability company with its principal place of business in Illinois. The Cline Group, LLC's sole member is Joshua Cline who is a citizen of Illinois.  *See* Accurint Address Report for Joshua Cline; S&P Capital IQ, The Cline Group, Private Company Profile; Pennsylvania Certificate of Organization for The Cline Group, LLC (showing Joshua Cline as the company's sole organizer).

5

18. The identity of the current public unit holders of Foresight Energy LP is not a matter of public record and solely within the control of Defendant or its affiliates. MEC is not aware of any public unit holder of Foresight Energy LP that is a citizen of Ohio. *See Carolina Cas. Ins. Co.* 741 F.3d at 1087 (holding that where "facts supporting jurisdiction are not reasonably ascertainable by the plaintiff," the plaintiff "should not be required to plead jurisdiction affirmatively based on actual knowledge" (citing *Hellman*, 610 F.3d at 376 for this "sensible principle")).

19. The parties are diverse because MEC is a citizen of Ohio and Williamson is, on information and belief, a citizen of Connecticut, Florida, Illinois, Kentucky, Massachusetts, Missouri, New York, Pennsylvania, Tennessee, Texas, and England.

20. The amount in controversy exceeds $75,000.

21. This court has subject matter jurisdiction under 28 U.S.C. § 1332(a).

22. This court has personal jurisdiction over Williamson because Williamson has been transacting and doing business in Illinois, and the transactions giving rise to the cause of action occurred in Illinois.

23. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to MEC's claims occurred in this Judicial District.

## BACKGROUND

24. MEC is a privately owned coal company founded in 1988. MEC operates underground and surface mining complexes throughout the United States, and produces and delivers bituminous coal to electric utility and industry customers in the United States and internationally. In southern Illinois, MEC operates longwall mining complexes in Hamilton, Saline, and Franklin Counties.

25. Williamson operates longwall coal mining complexes throughout central and southern Illinois. Williamson is one of MEC's primary competitors.

26. This litigation involves MEC mining operations in southern Illinois. At these locations, MEC employs a process known as longwall mining. Longwall mining is a form of full extraction underground coal mining whereby a full seam of coal is mined mechanically down a continuous face. Longwall mine panels are rectangular, approximately 1500 feet wide, and several miles long. The coal is cut down the entire length of the face and back again repeatedly by a machine called a longwall shearer.

27. The economic feasibility of longwall mining depends upon the ability of the longwall mine panels to be engineered for maximum length. Accordingly, the inability to mine any portion of a projected longwall panel can render the entire longwall panel un-minable.

A. The Proposed Transaction and Confidentiality Agreement

28. In or about January 2008, MEC and Williamson entered into discussions regarding the proposed sale by MEC to Williamson of MEC's Hamilton, Saline and Franklin longwall mining operations.

29. In connection with the Proposed Transaction, MEC and Williamson entered into the Confidentiality Agreement. *See* Ex. A.

30. The parties agreed that MEC would disclose certain confidential information related to its mining operations to Williamson, and that Williamson could review and use that information in considering the Proposed Transaction. *Id.* ¶¶ 1, 6. Williamson agreed to protect that information and use it solely to evaluate the Proposed Transaction. *Id.*

31. Specifically, in consideration for the mutual covenants contained in the Confidentiality Agreement, Williamson agreed that it would not use the information disclosed by MEC, including MEC's mining plans, "for any purpose other than determining whether to enter

7

into the [Proposed Transaction]." *Id*. ¶ 6.  Williamson further agreed "that for a period of thirty-six (36) months from the date of the signing of [the Confidentiality Agreement], it [would] not knowingly . . . divert or attempt to divert any business . . . of [MEC] or any any of its affiliates." *Id*.  Additionally, Williamson agreed not to circumvent MEC with respect to "all owned, leased and optioned property rights" then held by MEC "and other real property, including coal, surface, subsidence, and other related rights," or to "acquire or obtain rights to acquire any mineral leases, fee mineral leases . . . or other property right" in "all owned, leased and optioned property rights" then held by MEC.  *Id*.  The Confidentiality Agreement provided that: "It is the express intent of the parties that [Williamson] not use the Confidential Information to purchase or otherwise acquire rights in real property that may be required by [MEC] for the operation of the Coal Properties."  *Id*.

32. The mining plans and other maps and coal reserve information disclosed to Williamson detailed, among other things, the intended future location of MEC longwall mines.  MEC has a schedule for acquiring the necessary mining rights for the properties consistent with the progress of its operations.  Typically, MEC does not purchase mining rights to a property until one to five years (depending on various factors) prior to beginning mining operations on a tract identified in the plan.  Thus, the plans are highly confidential.  If MEC's intended future mining operations were made public, prospective sellers could hold out in an effort to force MEC to pay above-market prices.  Additionally, with knowledge of MEC's intended future mining operations, competitors such as Williamson could make strategic acquisitions of mining rights in an effort to frustrate future MEC operations. Accordingly, MEC's plans are not otherwise publicly available.

33. Under the terms of the Confidentiality Agreement, MEC informed Williamson, and Williamson specifically acknowledged, that: (i) the confidential information protected by the Confidentiality Agreement "derives independent economic value from not being readily known to, or ascertainable by, proper means by other persons who can obtain economic value from its disclosure or use; (ii) reasonable efforts have been made by MEC to maintain the secrecy of the confidential information; and (iii) the confidential information is and shall remain the sole property of MEC. *Id.* ¶ 1.

**B.     Williamson Breached the Confidentiality Agreement by Using Protected Information to Purchase Strategic Mining Rights**

34. Notwithstanding the express terms of the Confidentiality Agreement, Williamson used MEC confidential information in acquiring the Mining Rights, which are strategically located to frustrate MEC's intended mining operations.

35. Williamson purchased the Mining Rights at prices far exceeding their market value. Because the Mining Rights are insufficient to support an independent longwall mine, those rights have no economic value other than to frustrate the ability of Williamson's competitor, MEC, to effectuate the mining plans disclosed to Williamson in connection with the Proposed Transaction.

36. Williamson's purchases have hindered MEC's mining operations by frustrating MEC's ability to mine entire longwall panels, rendering the affected mines incapable of longwall mining consistent with MEC's plan.

37. The danger that Williamson, a competitor, would use MEC's mining plans strategically to acquire these or other mining rights was precisely the reason MEC insisted that Williamson agreed to the Confidentiality Agreement prior to MEC's disclosure of that confidential information.

9

### C.    MEC Suffered Damages As a Result of Williamson's Breach of the Confidentiality Agreement

38. As a result of Williamson's purchase of the Mining Rights, MEC has suffered substantial damages.  MEC has been forced to deviate from its normal practice of acquiring mining rights no earlier than five years prior to the date upon which it intends to begin mining the associated plot.  Additionally, as a result of Williamson's presence as an alternative buyer in the market, and its willingness to pay substantially more than market value (in some cases more than 4 to 5 times the average market prices), MEC has been forced to make preemptive acquisitions at artificially inflated prices, well above the acquisition prices MEC would have paid but for Williamson's interference. To date, MEC has expended millions of dollars to preemptively purchase or lease mining rights that it ordinarily would not have but for Williamson's misappropriation of MEC's confidential information.

39. MEC will also suffer additional damages related to lost revenue resulting from equipment downtime caused by MEC's inability to mine the longwall panels affected by Williamson's acquisition of the Mining Rights.  MEC loses thousands of dollars every minute the related mining equipment is not in use mining coal, a delay that would cost MEC millions of dollars in damages.  Furthermore, diverting this heavy mining equipment to other tracts or sites is expensive and will result in MEC incurring additional costs.

40. Further, MEC is a party to numerous contracts for the sale of coal to energy producers who have specific requirements for coal with unique sulfur content and heat values.  The coal mined from MEC's long wall operations in southern Illinois is unique in satisfying these specific requirements.  Williamson's continued use of MEC's confidential information threatens to frustrate MEC's ability to mine the coal necessary to fully perform under those agreements.  Failure to perform will cause MEC irreparable harm through the loss of

reputation, goodwill and future business opportunities.  The value of these lost opportunities is difficult if not impossible to measure.

## COUNT I

## BREACH OF CONTRACT

41. MEC restates and alleges each and every allegation set forth in Paragraphs 1–33 above as though fully set forth herein.

42. MEC has performed its obligations under the Confidentiality Agreement.

43. Pursuant to the Confidentiality Agreement, Williamson undertook certain duties and obligations.

44. Williamson has failed to fulfill its duties and obligations.

45. Williamson has breached, among other provisions, Section 6 of the Confidentiality Agreement by using information protected by the Confidentiality Agreement to identify and acquire the Mining Rights.

46. As a result of Williamson's breach, MEC has incurred damages in an amount to be quantified at trial.

47. Additionally, Williamson's breach has and will cause MEC irreparable harm.  In entering the Agreement, Williamson specifically acknowledged that the confidential information "was developed through substantial expenditures of time, effort and money and constitutes valuable proprietary and unique property of [MEC]."  Williamson further acknowledged that "money damages would not be a sufficient remedy for any breach of this Agreement, and that, accordingly in the event of such breach or threatened breach, [MEC] shall be entitled to equitable relief, including an injunction or specific performance (without the posting of any bond and without proof of actual damages)."  Williamson's use and disclosure of MEC's confidential information, and specifically information gleaned from

MEC's plan, will frustrate the purpose and effectiveness of the plan and MEC's existing coal supply contracts, which will result in the loss of goodwill, reputation and business opportunities, the full value of which is difficult if not impossible to measure.

## PRAYER FOR RELIEF

**WHEREFORE**, MEC requests that the Court:

a. enter judgment in its favor on Count I;

b. award MEC damages caused by Williamson's breach of contract;

c. preliminarily and permanently enjoin Williamson, its affiliates and all persons and entities acting in active concert with it from: (i) breaching any provision of the Confidentiality Agreement; (ii) purchasing or leasing any additional mining rights that frustrate or interfere with MEC's ability to carry out its plan;

d. ordering Williamson to offer MEC mining rights in the path of its plan at the prevailing market rates had Williamson not inflated prices through their predatory purchases;

e. award MEC its costs incurred in this action; and

f. award MEC any such other or further relief as the Court may find proper.

## JURY DEMAND

MEC demands a trial by jury on all claims and issues so triable.

Dated: July 15, 2014            Respectfully submitted,

                                                     /s/ Terrence J. Dee_____

Brian D. Sieve, P.C. (IL Bar No. 1699741)
(*Pro Hac Vice* Admission Pending)
Terrence J. Dee, P.C. (IL Bar No. 6215953)
Nicholas F. Wasdin (IL Bar No. 6310434)
(*Pro Hac Vice* Admission Pending)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: brian.sieve@kirkland.com
Email: terrence.dee@kirkland.com
Email: nick.wasdin@kirkland.com

Brad Badgley (00090131)
Brad Badgley, P.C.
26 Public Square
Belleville, IL 62220
Telephone: (618) 235-1000
Facsimile: (618) 235-1086
Email: bbadg@aol.com

*Attorneys for Murray Energy Corporation*

13